**Columbia Environmental Law Clinic**
**Morningside Heights Legal Services**
Susan J. Kraham #026071992
Edward Lloyd #003711974
435 West 116th Street
New York, NY 10027
P: 212-854-4291
F: 212-854-3554

**Eastern Environmental Law Center**
Jennifer Danis #047741998
50 Park Place, Ste. #1025
Newark, NJ 07102
P: 973-424-1166

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **NEW JERSEY CONSERVATION FOUNDATION** 170 Longview Road Far Hills, New Jersey 07931 **V.** **FEDERAL ENERGY REGULATORY COMMISSION** 888 First Street, N.E. Washington, D.C. 20426 and **CHAIRMAN NEIL CHATTERJEE, COMMISSIONER CHERYL LAFLEUR, COMMISSIONER ROBERT POWELSON** in their official capacities as Commissioners of the Federal Energy Regulatory Commission 888 First Street, N.E. Washington, D.C. 20426 Defendants. | Case No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff New Jersey Conservation Foundation ("NJCF") files this complaint against Defendants Federal Energy Regulatory Commission ("FERC"); FERC Chairman Neil Chatterjee, and FERC Commissioners Cheryl LaFleur and Robert Powelson in their official capacities. Plaintiff alleges and prays as follows:

**PRELIMINARY STATEMENT**

1. The Fifth Amendment to the U.S. Constitution has protected the people of the United States from unlawful taking of their land since 1791. No private property can be taken except for public use. The public use requirement is not optional. It must be demonstrated before the exercise of eminent domain, and it is a predicate to any inquiry regarding compensation.

2. There was a time in this country, decades ago, when there was a real fear that homes would not have enough heat for the winter, given the resources devoted to supporting war efforts and difficulty procuring supplies. To protect the public from this crisis, Congress passed the Natural Gas Act of 1938 ("NGA"), to allow the federal government to regulate the interstate transportation of natural gas in lieu of exclusive control by state governments. The Federal Power Commission, FERC's predecessor, was granted the power to award Certificates of Public Convenience and Necessity ("Certificates"). Those Certificates only authorize projects that FERC finds to be essential to the public's interest in receiving adequate supplies of natural gas resources and that will protect the public from corporate economic abuses that arise from private control of precious natural resources.

3. Yet shortages continued, both in steel and in transportation options for home heating, as natural gas companies flared off gas in the fields rather than subject themselves to federal

2

regulations. There was still no integrated and reliable network of natural gas pipelines by the end of the Second World War, with much of the natural gas stopping short of city limits. Thus, in 1947, Congress amended the NGA to authorize the exercise of eminent domain by Certificate holders. With these Certificates, companies could more easily build new natural gas pipelines to heat homes and create a national system of natural gas transportation.

4. The natural gas industry in the United States has changed significantly in the 70 years since Congress amended the NGA. There is no longer a tightly regulated market nor a wartime-induced fear of lack of gas for winter home heating. Now there is a deregulated market, and gas production, shipment, and consumption can be integrated into a single entity capable of passing higher rates onto consumers. Additionally, pipeline parent companies can profit from deals with their utility and distribution subsidiaries and transfer shipments from old pipelines to new pipelines without overall cost savings to consumers. Those parent companies are motivated by the availability of a 14 percent rate of return on investment that has been consistently awarded by FERC and described by the New Jersey Rate Counsel as "tantamount to winning the lottery."

5. There are now abundant natural gas supplies from extraction techniques unknown at the time of the NGA's passage. There are new kinds of energy security concerns and new natural resource conservation concerns, which have yielded federal laws requiring environmental protection and federal policies requiring carbon reduction. There is also a robust national network of natural gas transportation built out to the extent that there is excess capacity on many existing pipelines in that integrated web of diverse natural gas transportation options.

6. The NGA's "fundamental purpose is to protect natural gas consumers from the monopoly power of natural gas pipelines." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 833 (D.C. Cir. 2006). Although there are new threats to the public from pipeline construction and

unchecked expansion, FERC's mandate to protect ultimate consumers has not changed. And FERC is failing to discharge its duty.

7. FERC's current evaluation process for Certificates, which confer the power of eminent domain, falls short of the constitutional requirements under the Takings Clause of the Fifth Amendment. FERC has a pattern and practice of solely looking at preconstruction contracts for gas transportation service (called "precedent agreements") without an analysis of the legitimacy of the requested capacity or impacts on consumers, even where the buyer and seller share the same ownership. It is past time for FERC to evaluate pipelines in accordance with the Constitution and within the context of the current industry reality.

8. FERC's utter disregard for its mandate to protect consumers by ensuring that corporations and their pipeline projects are regulated to protect the public interest has been documented by independent analysts, consumers, ratepayers, ratepayer advocates, state utility commissions, state environmental protection agencies, non-profit environmental groups, and landowners. Yet FERC's unconstitutional practices have thus far evaded the Court's check on its actions, in part because FERC has created an administrative device referred to as a "tolling order" (where FERC unilaterally extends its time to consider rehearing requests beyond its statutory mandate). The practical result of such orders is to thwart meaningful and timely review of FERC decisions on specific project authorizations prior to land condemnation and preclude any challenges prior to pipeline construction.

9. FERC's failure to protect consumers and abide by the Constitution has many facets. It unfolds against the backdrop of complete disregard for the constitutional bar to a private party taking private lands without demonstrating a public use. FERC's exclusive reliance on pipeline companies' precedent agreements—deals that companies often enter into with their own

4

subsidiaries—to provide evidence of "market demand," and on an analysis that only addresses "market demand" while ignoring the potential economic impact of new projects, cannot fulfill the mandate to minimize consumer costs.

10. FERC's failure to ensure that the only pipelines built are those that are absolutely required to be built has burdened the parties FERC was meant to protect. While a constitutional public use analysis may be time-consuming or complex, that does not excuse FERC from doing its job. FERC acknowledges its duties to ensure that ratepayers are not harmed and that landowners do not suffer adverse effects to some extent in its Certificate Policy, but then issues Certificates that explicitly state it will not fulfill those duties. Instead, FERC assumes that the very companies it is meant to regulate have acted in consumers' and landowners' best interests.

11. FERC's practices have many victims: ratepayers, landowners, and the environment. FERC's disregard for the Constitution allows companies to take land that FERC has not ensured is necessary for a pipeline project that may not have the requisite public use. When FERC issues Certificates conditioned on subsequent state and federal approvals that have the power to change the route of the pipeline, the conditional Certificates have been used to condemn lands that may not be necessary for the construction of the pipeline. The Constitution requires that FERC has verified the public use of those lands. The Certificate cannot constitutionally convey eminent domain authority *before* the pipeline project has received all necessary state and federal approvals, because those approvals may never be issued. The pipeline may never get built, yet the landowners have had their lands taken and held by other private entities for a project that fails to come to fruition. In addition to harming landowners, FERC's failure to do a public use analysis puts the environment at risk as well. FERC is required to consider the environmental impacts of a pipeline when evaluating public use, but FERC cannot factor environmental impacts

into its public use analysis if it does not possess the actual findings with respect to those impacts from the regulatory agencies charged with making them. FERC routinely issues Certificates without such required findings for projects that are not yet legally authorized. Determinations of public convenience and necessity made without such required findings violate the Takings Clause by allowing the use of eminent domain without a public use.

12.  Plaintiff seeks declaratory relief to protect its constitutional rights to secure its private property from a government-sanctioned land grab for private fiscal gain.

## PARTIES

### Plaintiff

13.  Plaintiff NJCF is a 501(c)(3) not-for-profit organization headquartered at 170 Longview Road, Far Hills, New Jersey 07931. NJCF's mission is to preserve New Jersey's land and natural resources. NJCF owns over 20,000 acres of land preserved for the benefit of the public and the environment. For the past 50 years, NJCF has preserved more than 125,000 acres of land and has been critical to the passage of dozens of landmark environmental laws including the Freshwater Wetlands Protection Act, the Pinelands Protection Act, and the Highlands Water Protection and Planning Act.

14.  NJCF owns property known as Hunterdon County block 32, lot 4 in fee, and holds an easement on block 32, lot 33. Both lots are located in Delaware Township, Hunterdon County, New Jersey. This property is located along the proposed route of the PennEast pipeline. NJCF's land will be subject to eminent domain proceedings once the project is certificated.

15.  The pipeline will impact NJCF's property by interfering with NJCF's ownership of, access to, and normal use of its private lands. NJCF also allows the public to use its land for

hiking, biking, bird watching, and fishing. NJCF will suffer economic harm if the public, members, and potential members cannot use the land as originally intended.

**Defendants**

16. Defendant Federal Energy Regulatory Commission is an independent agency charged with, among other duties, assessing whether to issue Certificates to proposed pipeline projects pursuant to Section 7 of the NGA. FERC is headquartered at 888 First Street, N.E., Washington, D.C. FERC currently has three Commissioners.

17. Chairman Neil Chatterjee was nominated to FERC by President Donald Trump in May 2017 and confirmed by the U.S. Senate on August 4, 2017.

18. Commissioner Cheryl LaFleur was nominated to FERC by President Barack Obama in 2010 and was confirmed for a second term by the U.S. Senate in 2014.

19. Commissioner Robert Powelson was nominated to FERC by President Donald Trump in May 2017 and confirmed by the U.S. Senate on August 4, 2017.

## JURISDICTION

20. This action arises under the Takings Clause of the Fifth Amendment to the United States Constitution, and, thus, this Court has federal question jurisdiction under 28 U.S.C. § 1331.

21. This Court has personal jurisdiction over FERC because FERC conducts business in the State of New Jersey, including engaging in activities related to planning and constructing an interstate natural gas pipeline, as well as the regulation of pipeline approval, construction, and operations.

22. Plaintiff seeks a declaratory judgment under the federal Declaratory Judgments Act, 28 U.S.C. §§ 2201–2202, and appropriate injunctive relief pursuant to Fed. R. Civ. P. 65.

23. Venue is proper in the District of New Jersey pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1) because the property that is subject to the action is situated in this judicial district and the defendant is an agency of the United States.

## FACTS

### Fifth Amendment

24. The Takings Clause of the Fifth Amendment requires that any property taken from private owners must be for "public use." U.S. Const. amend. V.

### Natural Gas Act

25. Congress adopted the Natural Gas Act in 1938. In justifying the need for federal regulation, Congress determined that the business of the transportation of natural gas was "affected with a public interest." 15 U.S.C. § 717(a).

26. The NGA was amended in 1947 to provide FERC with the power to grant eminent domain authority to Certificate holders. Act of July 25, 1947, ch. 333, 61 Stat. 459.

27. The NGA tasks FERC with reviewing applications for the construction and operation of interstate natural gas pipelines.

28. Section 7(e) of the NGA requires FERC to determine whether each proposed interstate natural gas pipeline is required by the public convenience and necessity and, only if it so determines, to issue a Certificate allowing for the construction of the pipeline. 15 U.S.C. § 717f(e). Otherwise, "such application shall be denied." *Id.*

8

29. Once FERC has made an individual determination that a proposed pipeline project is required by the "public convenience and necessity," and grants a Certificate to a pipeline company, 15 U.S.C. § 717f(e), the holder may exercise the power of eminent domain over land necessary for the project's construction and operation. *Id.* § 717f(h).

30. While federalizing regulation of the business of transporting natural gas was essential to protecting the public interest, the NGA is clear that an individualized analysis of any proposed pipeline is required to determine if that pipeline is in the public convenience and necessity.

31. The Constitution requires a "public use" for the exercise of eminent domain. FERC's determination under Section 7(e) that a project "is or will be required by the present or future public convenience and necessity" must also satisfy the Fifth Amendment's "public use" criterion.

32. FERC's mission includes considerations of clean air and other environmental benefits, and the energy security of the nation. *Guardian Pipeline, L.L.C.,* 94 FERC ¶ 61,269, at 61,948 (2001) (order on rehearing and issuing Certificates).


**Policy Statement**

33. FERC has articulated its interpretation of the NGA's "public convenience and necessity" standard in a series of Orders, collectively known as FERC's Certificate Policy. *Certification of New Interstate Gas Pipelines*, 88 FERC ¶ 61,227 (Sept. 15, 1999), clarified, 90 FERC ¶ 61,128 (Feb. 9, 2000), further clarified, 92 FERC ¶ 61,094 (Jul. 28, 2000).

34. The Certificate Policy broadly describes the benefits of a project and the adverse effects that should be considered when deciding whether to grant a Certificate. "[T]he Commission said that it was considering how best to balance demonstrated market demand

9

against potential adverse environmental impacts and private property rights in weighing whether a project is required by the public convenience and necessity." 88 FERC ¶ 61,227, at 61,737.

35. As FERC articulated in its Certificate Policy, the NGA requires FERC to consider adverse environmental impacts in its analysis of public convenience and necessity. *Id.* at 61,749. Thus neither public convenience and necessity, nor public use, may be determined without considering the environmental impact.

36. The Certificate Policy also explains that the public convenience and necessity standard requires that "the Commission will consider all relevant factors reflecting on the need for the project. These might include, but would not be limited to, precedent agreements, demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of capacity currently serving the market." *Id.* at 61,747.

37. In its Certificate Policy, FERC further determined that, for its analysis, "[t]he types of public benefits that might be shown are quite diverse but could include meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives." *Id.* at 61,748.


**FERC's Pattern and Practice**

38. FERC's actual practice in its benefits analysis is to look no further than the percentage of the pipeline's capacity that has been contracted for with natural gas shippers—i.e., precedent agreements.

39. Notwithstanding the Certificate Policy, FERC has stated that it is not obligated to "assess a project's benefits by looking beyond the market need *reflected by the applicant's*

*existing contracts with shippers.*" *Dominion Carolina Gas Transmission, L.L.C.*, 158 FERC ¶ 61,126, at 61,789 n.30 (2017) (emphasis added) (order issuing Certificate).

40. FERC asserts that "it is current Commission policy to not look behind precedent or service agreements to make judgments about the needs of individual shippers." *Atlantic Coast Pipeline, L.L.C.*, 161 FERC ¶ 61,042, 2017 WL 4925429, at *13 (Oct. 13, 2017) (order issuing Certificates). In fact, FERC has now questioned whether it even can look beyond precedent agreements as proof of public benefits: "Any attempt by the Commission to look behind the precedent agreements in this proceeding might infringe upon the role of state regulators." *Id.* at *15.

41. Dissenting from a grant of a Certificate, Commissioner Cheryl A. LaFleur wrote:

The Certificate Policy Statement established a policy for determining economic need that allowed the applicant to demonstrate need relying on a variety of factors, including 'environmental advantages of gas over other fuels, lower fuel costs, access to new supply sources or the connection of new supply to the interstate grid, the elimination of pipeline facility constraints, better service from access to competitive transportation options, and the need for an adequate pipeline infrastructure.' *However, the Commission's implementation of the Certificate Policy Statement has focused more narrowly on the existence of precedent agreements.*

Cheryl A. LaFleur, Statement on Order Issuing Certificates and Granting Abandonment Authority, Nos. CP15-554-000, CP16-10-000 (Oct. 13, 2017) (emphasis added).

42. Acting Chairman Chatterjee said in a speech to the Energy Bar Association that LaFleur's dissenting opinion "suggested that FERC should depart from *its long-standing policy of relying on agreements with shippers* to demonstrate economic need in favor of weighing a broad range of economic, social and aesthetic values." Neil Chatterjee, Chairman, Fed. Energy Regulatory Comm'n, Address at the Energy Bar Association 2017 Mid-Year Energy Forum (Oct. 17, 2017) (emphasis added).

43. The statements by FERC's Commissioners and its previous orders granting Certificates show an established pattern and practice of FERC confining its public benefit analysis of proposed pipelines to a simple reliance on the project proponent's calculation of the pipeline's subscribed capacity.

44. Since FERC promulgated its Certificate Policy in 1999, the agency has found every project with a large percentage of its capacity subscribed through private contracts to be required by public convenience and necessity.

## Consequences of FERC's Pattern and Practice

45. Beginning in the 1980s, FERC pursued a policy of deregulation. *See* Steve Isser, *Natural Gas Pipeline Certification and Ratemaking* 8–11 (2016), http://rethinkenergynj.org/wp-content/uploads/2016/10/ISSER_REPORT_CV.pdf.

46. In 1992, as part of this policy of deregulation, FERC "unbundled" the natural gas market, separating sales services from transportation services. *Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations, Order No. 636*, 59 FERC ¶ 61,030 (1992) (codified at 18 C.F.R. pt. 284).

47. In the modern unbundled market, pipelines can be financed through long-term contracts for capacity with local distribution companies and utilities that are the pipeline companies' own affiliates and subsidiaries of the pipeline company. Unlike the arm's-length transactions with unrelated entities that FERC had relied on before 1992 to gauge market demand, contracts for capacity between pipeline companies and their own subsidiaries and affiliates no longer accurately reflect market conditions.

48. In a separate statement included as part of a Commission order, former FERC Chairman Commissioner Norman Bay wrote:

> Pipelines are capital intensive and long-lived assets. It is inefficient to build pipelines that may not be needed over the long term and that become stranded assets. Overbuilding may subject ratepayers to increased costs of shipping gas on legacy systems. If a new pipeline takes customers from a legacy system, the remaining captive customers on the system may pay higher rates. Under such circumstances, a cost-benefit analysis may not support building the pipeline.
>
> *Nat'l Gas Fuel Supply Corp.*, 158 FERC ¶ 61,145, 2017 WL 496277, at *57 (Feb. 3, 2017) (Bay, Commissioner, separate statement on order granting abandonment and issuing Certificates).

49. Thus, the existence of precedent agreements does not, on its own, demonstrate public use.

50. Additionally, FERC has a practice of issuing Certificates conditioned on receiving subsequent federal or state approvals.

51. The NGA authorizes FERC to issue Certificates "with such reasonable terms and conditions as the public convenience and necessity may require," 15 U.S.C. § 717f(e), but does not provide for making additional necessary federal authorizations a "condition" of the Certificate.

52. Such subsequent authorizations may require changes to the proposed pipeline route or prohibit the construction of the proposed pipeline.

53. FERC regularly issues conditional Certificates that allow the Certificate holder to exercise the right of eminent domain *before* required federal and state authorizations have been granted.

54. FERC routinely issues Certificates prior to receiving environmental impact findings from the regulatory agencies charged with making them.

55. FERC admits a conditional Certificate is "an incipient authorization without current force and effect." *Crown Landing LLC*, 117 FERC ¶ 61,209, at 62,106 (2006) (order denying rehearing and issuing clarification). Despite this concession and these significant conditions on the Certificate, FERC still permits the exercise of eminent domain.

56. FERC cannot factor in the adverse environmental impact of a pipeline project if it does not possess the actual environmental impact findings from the regulatory agencies charged with making them.

**FERC Certificate Rehearing and Review Process**

57. Under 15 U.S.C. § 717r(a), parties aggrieved by a FERC order, including landowners injured by improper exercise of eminent domain, must first apply for rehearing within 30 days of the order.

58. Following the application for rehearing, FERC has the "power to grant or deny rehearing or to abrogate or modify its order without further hearing" within 30 days; otherwise the request is considered denied. 15 U.S.C. § 717r(a).

59. FERC has established a pattern and practice of granting rehearing of a Certificate solely to extend its time to decide on the merits through the use of tolling orders.

60. FERC consistently waits to rule on the merits of its orders until after eminent domain has been exercised, foreclosing all meaningful judicial review of constitutional claims related to eminent domain.

14

61. Since 2009, FERC has tolled its time to rule on the merits of cases requesting rehearing 74 out of 75 times, with an average tolling delay of 194 days. During that delay, condemnation proceeds. *See* Emergency Petition for a Writ Staying the FERC Order, at 6 n.2, 10, Exhibit K, *In Re Sierra Club*, No. 17-01240 (D.C. Cir. Nov. 13, 2017).

**The Limits of FERC's Jurisdiction**

62. FERC does not have the power to grant the relief requested, as Section 717f(h) of the NGA automatically endows the holder of a Certificate with eminent domain authority, and "the Commission does not have the discretion to deny a certificate holder the power of eminent domain." *Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 973 (D.C. Cir. 2000).

63. FERC has also determined that review of its orders under 15 U.S.C. § 717r does not extend to determinations of the constitutionality of the exercise of eminent domain under the NGA, and that such constitutional matters are outside the scope of its jurisdiction. *See Mountain Valley Pipeline, L.L.C.*, 161 FERC ¶ 61,043, 2017 WL 4925425, at *15 (Oct. 13, 2017) (order issuing Certificates and granting abandonment authority); *Atlantic Coast Pipeline, L.L.C.*, 161 FERC ¶ 61,042, 2017 WL 4925429, at *20 (Oct. 13, 2017) (order issuing Certificates).

64. Claims challenging the constitutionality of FERC's grant of eminent domain are therefore outside the agency's expertise.

65. Congress did not intend for constitutional questions related to eminent domain to be decided by FERC.

66. The eminent domain claims fall under the purview of the Constitution and are wholly collateral to the NGA's review provisions.

67. Without the declaratory relief Plaintiff seeks, FERC's established pattern and practice of allowing eminent domain to be exercised during rehearing proceedings will result in injury to Plaintiff.

68. FERC grants Certificates to nearly 100 percent of applicants, and this approval ratio "is high enough to state a likelihood of approval for standing purposes." *Del. Riverkeeper Network v. FERC*, No. 16-cv-416 (TSC), 2017 WL 1080929, at *6 n.2 (D.D.C. Mar. 22, 2017) (holding that landowners have standing to challenge the constitutionality of FERC's Certificate programs).

## CAUSES OF ACTION

**Count 1: FERC's Issuance of Certificates Delegating the Power of Eminent Domain in the Absence of Adequate Public Use Analyses Violates the Takings Clause of the Fifth Amendment of the Constitution.**

69. Plaintiff incorporates the allegations in paragraphs 1 through 68.

70. The Takings Clause of the Fifth Amendment requires that any property taken from private owners must be for "public use." U.S. Const. amend. V.

71. FERC's pattern and practice is to rely only on the existence of precedent agreements between private parties in determining whether to issue Certificates.

72. The existence of precedent agreements between private parties does not establish the constitutionally required showing of public use.

73. FERC's practice of conferring eminent domain authority pursuant to a Certificate issued without looking beyond precedent agareements violates the Fifth Amendment's Takings Clause by authorizing the PennEast pipeline or any other pipeline without the constitutionally required public use analysis .

16

**Count 2: FERC's Practice of Granting Eminent Domain Prior to Receiving Environmental Impact Findings from the Regulatory Agencies Charged with Making Them Violates the Takings Clause of the Fifth Amendment of the United States Constitution.**

74. Plaintiff incorporates the allegations in paragraphs 1 through 73.

75. FERC must conduct an individualized assessment to determine whether a proposed pipeline is required by the public convenience and necessity, and thus the public use.

76. To satisfy the Constitution's public use requirement, the individualized assessment must include the environmental impact findings by the state and/or federal regulatory resource agencies charged with making determinations that could impact the route or construction of the proposed pipeline.

77. FERC cannot make the required public use finding for the PennEast pipeliine or any other pipeline without an individualized determination that includes these environmental impacts.

78. A delegation of the power of eminent domain by FERC in the absence of public use violates Plaintiff's rights under the Takings Clause of the Fifth Amendment.

**Count 3: FERC's Practice of Issuing a Certificate Conditioned on Subsequent State and Federal Authorizations That May Require Changes to the Pipeline Route or Prevent Construction Thereof Violates the Takings Clause of the Fifth Amendment of the United States Constitution.**

79. Plaintiff incorporates the allegations in paragraphs 1 through 78.

80. To set an appropriate constitutional limit on its delegation of eminent domain authority, Congress limited that delegation to "the *necessary* right-of-way to construct, operate, and maintain a pipe line . . . and the *necessary* land . . . for the location of . . . stations or

equipment *necessary* to the proper operation of such pipe line." 15 U.S.C. § 717f(h) (emphasis added).

81. Land cannot be "necessary" when pending approvals before other state and federal agencies may require a route change or preclude the pipeline's construction entirely, such that the land will not be used for construction, operation, or maintenance of a pipeline.

82. The holder of a conditional Certificate whose unsatisfied conditions consist of other federal or state authorizations with the power to require a route change, or that may preclude the pipeline's construction, cannot constitutionally exercise eminent domain.

83. The exercise of eminent domain by PennEast or any ohter conditional Certificate holder violates the Takings Clause of the Fifth Amendment.


## Relief Requested

WHEREFORE Plaintiff respectfully requests this Court enter a judgment and order declaring that:

A. FERC's practice of delegating eminent domain authority pursuant to a Certificate issued without the requisite public use analysis violates Plaintiff's substantive rights under the Fifth Amendment's Takings Clause by authorizing takings that are not for a public use.

B. FERC's practice of granting eminent domain prior to receiving environmental impact findings from the regulatory agencies charged with making them violates the Takings Clause of the Fifth Amendment of the United States Constitution.

C. FERC's practice of issuing a Certificate conditioned on subsequent state and federal authorizations that may require changes to the pipeline route or prevent construction thereof violates the Takings Clause of the Fifth Amendment of the United States Constitution.

18

D. Such other relief as the Court deems appropriate.

Respectfully submitted

/s/ Jennifer Danis
Eastern Environmental Law Center

/s/ Edward Lloyd
/s/ Susan Kraham
Columbia Environmental Law Clinic
Morningside Heights Legal Services

Counsel for Plaintiff
New Jersey Conservation
Foundation

Dated November 22, 2017